UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-CIV-22308-HOEVELER

CINDY FILS and NEMOURS MAURICE,

    Plaintiffs,

v.

CITY OF AVENTURA, et al.

    Defendants.
_____/

### ORDER ON REMAND

    Before the Court are four motions for summary judgment. On September 19, 2008, the City of Aventura and Aventura police chief Thomas Ribel filed separate motions for summary judgment against the plaintiffs (ECF No. 138 and 139). On October 2, 2008, police officers Sean Bergert, Charles Carlantone, Jeffrey Burns, Christopher Goranitis, Jason Williams, and Harvey Arango filed a joint motion for summary judgment against Cindy Fils (ECF No. 160), and a joint motion for summary judgment against Nemours Maurice (ECF No. 159). All four motions primarily addressed whether the defendants were entitled to qualified immunity.

    On January 29, 2009, the Court denied all four motions in a cursory order [ECF No. 195], and the defendants appealed.[1] On July

_____

    [1] In ruling on the motions the first time, the Court considered the plaintiffs' December 24, 2008 "revised" opposition papers (ECF

6, 2010, the United States Court of Appeals for the Eleventh Circuit issued an order of limited remand instructing me to provide a more comprehensive ruling on the motions for summary judgment, because my initial treatment was not amenable to meaningful appellate review. The court of appeals retained jurisdiction to ensure a speedy resolution of the qualified immunity issues. Upon further consideration of the facts, and viewing them through the correct legal standard, I must humbly alter my conclusions. It is clear to me now that I erred in denying all four summary judgment motions without methodically evaluating each claim against each defendant. In this revised order, I have endeavored to perform my job of conducting a proper analysis, in the manner I should have done the first time.

## I. BACKGROUND

### A. The fourth amended complaint

This lawsuit was filed on August 19, 2005. The forth amended complaint ("the complaint") was filed July 6, 2007. The case is brought by the plaintiffs against the City of Aventura, Aventura

---

Nos. 185, 186, 188, and 189). The revised submissions were almost exactly the same as the original versions from December 4, 2008 (ECF Nos. 172-175), but with numbered paragraphs. The plaintiffs did not present new arguments or allegations in the December 24 papers. Both sets of submissions relied on the same fifteen exhibits, which were listed in an "appendix" filed on December 8, 2008 (ECF No. 176). Initially, only some of the exhibits in the appendix were filed electronically, but they were delivered to the Court in hard copy on or about December 8, 2008. Much later, they were all filed electronically (ECF No. 204).

police chief Thomas Ribel, and six individual police officers, alleging state torts and federal constitutional violations arising from the plaintiffs' arrest on August 23, 2003. The complaint asserts twenty-four counts against the various defendants, which I will summarize.

In Counts I and II, plaintiffs Cindy Fils and Nemours Maurice, respectively, assert false imprisonment claims against the six Aventura police officers. In Counts III and IV, the plaintiffs assert the same false imprisonment claims against the City of Aventura.

In Count V, Fils asserts a civil rights claim under 42 U.S.C. § 1983 against police officer Sean Bergert, for depriving her constitutional rights under the color of state law. According to the complaint, the "rights" that Officer Bergert violated are:

> "a. the right and privilege not to be deprived of her life and liberty without due process and equal protection of the law; and/or
>
> b. the right and privilege to be free from unlawful attack upon the physical integrity of her person; and/or
>
> c. the right and privilege to be secure in her person while in the custody of police officers; and/or
>
> d. the right and privilege not to be subjected to punishment without due process of law; and/or
>
> e. the right and privilege while in custody to be free from illegal assault and battery by any person exercising the authority of the CITY OF AVENTURA, CITY OF AVENTURA POLICE DEPARTMENT and the State of Florida; and/or
>
> f. the right and privilege to be free from cruel and unusual punishment; and/or

-3-

g. the right to be free from physical abuse and intimidation; and/or

h. the right to be free from unreasonable seizure."

In Counts VI - X, Fils repeats the same allegations verbatim in separate § 1983 claims against the other five police officers. In turn, in Counts XI - XVI, Nemours Maurice repeats identical § 1983 allegations against each of the six police officers. Despite the officers' different roles in the plaintiffs' arrests, every § 1983 claim asserted against the police officers is exactly the same.

In Counts XVII and XVIII, Fils and Maurice, respectively, claim that the City of Aventura and police chief Thomas Ribel (in his individual and official capacities) are liable under § 1983 for instituting a practice or policy of deliberate indifference to the hiring and screening of Aventura police officers. Similarly, in Counts XIX and XX, Fils and Maurice assert § 1983 claims against Chief Ribel and the City of Aventura for failing to properly train and supervise members of the Aventura police force.

In Counts XXI and XXII, Fils and Maurice, respectively, allege that all six police officers are liable for malicious prosecution under Florida law, for initiating criminal proceedings without probable cause. Finally, in Counts XXIII and XIV, the plaintiffs charge the six police officers with committing state-law batteries.

-4-

### B.   Factual background

The facts, as set forth below, are viewed in light most favorable to the plaintiffs. At times, conflicts in the evidence are noted, but the version used in analyzing the summary judgment motions is the plaintiffs' version.[2]

On the night of Friday, August 23, 2003, Cindy Fils and Nemours Maurice were on a date to a hip-hop event at Broadway Billiards in Aventura. Fils Dep. 51, July 3, 2007. The event was hosted by Mr. Maurice's acquaintance Jimmy Augustine, as well as promoter Nerlange Cineus and the club disk jockey Bernie Jadotte. Maurice Dep. 45, June 27, 2007. The plaintiffs arrived at the club sometime after midnight and sat at the bar. Fils Dep. 53-54. They chatted while Ms. Fils drank one or two cocktails and Mr. Maurice played on a video arcade. Maurice Dep. 76. They remained in the bar area until sometime close to 3:00 a.m., when Maurice observed an altercation between a man and a woman on the dance floor. Id. at 95. Maurice walked over and spoke to the woman, Julie Etienne, who claimed to have been physically assaulted. Id. at 103, 107. Maurice offered to escort Ms. Etienne to the parking lot so she could explain what happened to the off-duty police officers Elricco

---

[2] When conducting a qualified immunity analysis at the summary judgment stage, a district court "must take the facts in light most favorable to the party asserting the injury." Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). The Court thereby eliminates disputed issues of fact and takes the plaintiffs' best case.

Barnes and Jason Williams.[3] Id. at 107; Cineus Dep. 64, Sept. 19, 2007. Ms. Eteinne was screaming and angry as she and Maurice walked toward the exit, and she became confrontational with the police officers once she was outside. Maurice Dep. 108, 111.[4] Officer Barnes eventually attempted to put Ms. Eteinne in handcuffs, which she resisted. Maurice Dep. 120. Barnes struggled for a moment to apply the handcuffs, and either verbally instructed Ms. Eteinne to sit on the ground or physically forced her to the ground, depending on whose story you believe. Id. at 112. Meanwhile, Ms. Eteinne's companion, Latrice Edwards, began protesting her friend's arrest and challenging Officer Barnes. Id. at 113. Officer Barnes warned Ms. Edwards to stand back more than once, but she did not comply. Id. at 120. Officer Barnes then shot Ms. Edwards with a taser gun and she fell to the ground. Id. at 113.[5] By this point, a crowd of somewhere between fifteen and thirty-five patrons from Broadway Billiard's had gathered in the parking lot, including Ms. Fils,

---

[3] They were hired to provide private security. To the extent it is relevant to claims that the police response to the events on August 23, 2003 was racially motivated, the Court notes that Officers Barnes and Williams are African American.

[4] The facts even up to this point differ significantly among the plaintiffs' witnesses. Nerlange Cineus recalled that she and Maurice were already in the parking lot looking for Jimmy Augustine when private bouncers dragged Ms. Eteinne and her companion, Latrice Edwards, outside the club. Cineus Dep. 24:5.

[5] According to Maurice's assessment of the situation, Officer Barnes's use of force against Ms. Edwards appeared to be justified. Maurice Dep. 135.

Jimmy Augustine, Nerlange Cineus, and Bernie Jadotte.[6] Several Aventura police cruisers arrived, along with a paddy wagon and a police K-9 unit. Cineus Dep. 72.

As the situation with Ms. Eteinne and Ms. Edwards was calming down to some extent,[7] Maurice and Jimmy Augustine walked toward the entrance of the club and began telling patrons to either enter or exit, but not to crowd around the doorway. Maurice Dep. 134. Maurice claims he was facing the entrance when he commented to Augustine about the Aventura police force, saying in a regular tone of voice: "they're overreacting, these motherfuckers are overreacting." Id. at 143-44. Officer Sean Bergert (who was the first back-up unit to arrive, according to the plaintiffs' summary judgment papers) was a short distance behind Maurice and overheard

---

[6] In their summary judgment papers, Fils and Maurice both allege that "a crowd of 20-35 people gathered" outside the club not including policemen. See, e.g., Maurice's Resp. to Officers' Mot. for Summ. J. ¶ 5, December 24, 2008, ECF No. 188, although both plaintiffs testified in their depositions that the number was closer to fifteen. The higher estimate is consistent with Cineus' recollection of twenty-five to thirty people. Cineus Dep. at 58:4. In any event, there was a crowd.

[7] Cineus testified that the chaos in the parking lot was suspended to some degree between the tasings of Ms. Edwards and Mr. Maurice. Cineus Dep. 38:17-25 ("before Maurice got tased, it was pretty okay. It was okay. . . . It was chaos after Maurice was down because no one was holding the [club] door"). Maurice testified that situation was calm in the moments before he was tased, Maurice Dep. 139:9, but acknowledged that, "with the tasing [of Ms. Edwards] and everything, I thought it was time for us to leave," id. at 133:7-9.

the comment.[8] Id. at 141. Officer Bergert asked, "what you said, motherfucker?" Id. at 141. Maurice turned around and saw Officer Bergert standing several feet away with his taser drawn. Id. at 141:14; Fils Dep. 94:9. Maurice raised his hands and took a step back. Maurice Dep. 144. According to Maurice, Officer Bergert had not made any commands up until this point, and he did not direct Maurice to surrender or return to the club. Id. at 148-49, 156; Fils Dep. 82.[9] As the two men allegedly stood in silence, Officer Bergert fired his twin taser probes into Maurice's chest and delivered the electricity. Maurice's body became tense and his knees locked up, but he did not fall to the ground. Maurice Dep. 153. Maurice testified that once he was on the ground, "Bergert had his knees in the back of my head [and] I believe it was him that did the contact tase in the back of my neck. And he was grinding

---

[8] According to the complaint, Bergert was actually in his patrol car when he heard the comment. Compl. ¶ 20.

[9] Cineus had a different account. She testified that once the wave of police officers arrived they made several announcements for the crowd to clear the parking lot or return to the club. Cineus Dep. 41. Officer Bergert explicitly instructed Maurice to move away from the area two or three times, id. at 41:9, 45:15, but Maurice "couldn't go back inside because the crowd was already at the door." Id. at 40:14-15. Cineus claims that Bergert eventually attempted to push Maurice inside, and Maurice was saying "[w]ait, wait. I'm on your side. I'm with you guys." Id. at 42:12. "Maurice had his back against the glass window of the door, and Bergert tased him, and [Maurice] shivered a little bit. [Maurice] was still fighting though." Id. at 44:5-9. When asked what she meant by "still fighting" Cineus explained, "he was still trying to stay up. He was still trying to hold himself, and there was another cop that rushed in to help Bergert, and they were both down on the floor." Id. at 44:13-16.

the taser in the back of my neck and saying, you mother fucker, you mother fucker." Maurice Dep. 149:9-15.[10] Either while Maurice was standing or after he was on the ground,[11] Officer Williams shot his taser probes into Maurice's rib cage, because Williams perceived Maurice to be struggling against Bergert. See J. Williams Dec. ¶ 12, ECF No. 155, Ex. 1; Fils Dep. at 86, 88. Williams and then a third officer crouched beside Maurice with Bergert and began taking him into custody. Cineus Dep. 46:19-22.

During and after the tasing, Ms. Fils was positioned several feet behind Officers Bergert and Williams. Fils. Dep. 85-86. Once Maurice was on the ground, she moved closer to the huddle of police officers and yelled at them for thirty seconds, urging them to release Maurice. Id. at 95. At some point Fils "stepped forward to tell [the police], let [Maurice] go" but she denies making physical contact. Id. at 95, 97. According to Fils, the police did not ask her to stop yelling or to back off. Without warning, Burns came

---

[10] The taser guns were loaded with a single charge that fires two "darts" or "probes" at a same time. On some models, after the probes are fired, the tip of the gun barrel acts as a stun gun. By pressing the end of the taser against someone's body or clothing, the gun delivers an electric shock. This is what Maurice claims Bergert did to him. Maurice Dep. 29:15-30:10. In Bergert's police report, he acknowledges applying a "contact application" of his taser against Maurice's neck area after he fired the probes, because Maurice continued to "swing his arms [and] fists." See Bergert's "Response to Resistance Report," Aug. 23, 2003, ECF No. 140-2, pp. 3-4.

[11] At one point, Cineus testified that "[t]here was a second officer, but he came when--when Maurice was already on the ground." Cineus Dep. 84:5-6.

"out of nowhere," picked her up, and smashed her body onto the pavement.[12] Id. at 97. Her head hit the ground and she claims she was knocked semiconscious. Id. at 98; Cineus Dep. 91.

In her deposition, Fils was asked, "[w]ere you tased?" Her response was, "[n]o, not that I remember." Fils Dep. 98:7-8. In fact, Fils does not allege she was tased in any of her pleadings. According to police reports, however, Bergert applied a "contact application" of his taser to Fils's upper chest after she allegedly jumped on him. See Ribel's Concise Statement of Material Facts, Ex. A, Part 1, pp. 2-3, ECF No. 140-2. The computer chip on Bergert's taser confirms that he discharged the device three times between 3:13:16 a.m. and 3:13:35 a.m. on August 23, 2003. See id. at Part 6, p. 6, ECF No. 140-7. Once Fils was on the ground, Officer Carlantone then handcuffed her and took her into custody. Fils claims she suffers from chronic headaches from the incident. Fils Dep. 19, 29.

Maurice's arrest affidavit indicates he was charged with, (1) disorderly conduct, in violation of Fla. Stat. § 877.03, and (2) resisting arrest without violence, in violation of Fla. Stat.

---

[12]The police officers allege that Fils jumped on Bergert's back and struck him numerous times with her fists. Ms. Cineus recalled that Fils was protesting: "Wait, he's with me. He didn't do anything," Cineus Dep. 48:20, then Fils apparently tried to inject herself into the huddle as the police were handcuffing Maurice, "pushing her way through them." Id. at 50, 52:15. Cineus denied seeing Fils pound on any police officer with her fists, she just "went into that huddle, and [the police officer] grabbed her, turned around and slammed her." Id. at 88, 89.

§ 843.02. <u>See</u> Maurice Arrest Aff. DE 140-2. Both charges against Maurice were dismissed after he agreed to pay a fine, enroll in anger management classes, and perform community service. Ribel's Concise Statement of Material Facts ¶ 20.

Fils was charged with, (1) battery on a law enforcement officer, in violation of Fla. Stat. § 784.07, (2) resisting arrest with violence, in violation of Fla. Stat. § 843.01, (3) and disorderly conduct, in violation of Fla. Stat. § 877.03. She was tried and acquitted of all charges in the Circuit Court for Miami-Dade County.

## II. **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact for trial, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. See <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. <u>See</u> <u>Allen</u>, 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences in the light most favorable to the non-moving party and

determine whether that evidence could reasonably sustain a jury verdict. <u>Celotex</u>, 477 U.S. at 322-23. Further, while the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. <u>Anderson</u>, 477 U.S. at 252. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative, is not enough. <u>Id.</u>

### III. **DISCUSSION**

#### A.   **Section 1983 claims against the police officers**

In Counts V - XIV the plaintiffs seek to recover under 42 U.S.C. § 1983 from the six Aventura police officers. In their motions for summary judgment, the police officers argue that they are entitled to qualified immunity.

Qualified immunity protects government officials sued in their individual capacities, as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1205 (11th Cir. 2009). The purpose of qualified immunity is to allow officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, <u>Anderson v. Creighton</u>, 483 U.S. 635, 638-39 (1987), "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (internal citation and quotation marks omitted).

To receive qualified immunity, an official must first establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Lee, 284 F.3d at 1194. If the official was acting within the scope of his discretionary authority--and it is undisputed that all the police officer defendants were--the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Id.

The next part of the qualified immunity framework is governed by Saucier v. Katz, 533 U.S. 194, 201 (2001). Under Saucier, qualified immunity exists unless the plaintiff can establish two things: first, that under the plaintiff's version of the facts, the defendant's actions violated a constitutional right; second, that the right violated was "clearly established" at the time. Id.; Vinyard v. Wilson, 311 F.3d 1340, 1349-50 (11th Cir. 2002). To demonstrate that a right was "clearly established," the plaintiff must show that when the defendant acted, the law established the contours of the right so clearly that a reasonable officer would have known his acts were unlawful. Anderson, 483 U.S. at 640.

Thus, the rule is that a police officer is generally not liable for his misconduct unless the plaintiff can point to pre-existing decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the state (in this case, the Florida Supreme Court) that would have provided fair warning to the police officer that what he did was illegal.

-13-

Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000). The standard for deciding if an officer's conduct violated clearly established law is purely objective; the officer's subjective intent or belief is irrelevant. See Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990).

In Pearson v. Callahan, --- U.S. ---, 129 S.Ct. 808 (2009), the Supreme Court reaffirmed the basic qualified immunity standard but held that federal courts are no longer obliged to conduct the qualified immunity analysis in the order articulated by Saucier v. Katz. Rather, judges are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Pearson, 129 S.Ct. at 818.

Logically, "[t]he first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). In presenting their § 1983 claims against Officers Bergert, Carlantone, Burns, Goranitis, Williams, and Arango, the plaintiffs list a variety of "rights" that the police officers allegedly violated, without making reference to any specific provisions of the Constitution. This is unhelpful. The plaintiffs appear to pattern their claims on language drawn from the Fourth, Fifth, Eighth, and Fourteenth Amendments. In reality, all the plaintiffs' § 1983 claims against the police officers pertain to the plaintiffs' unlawful arrests.

-14-

Specifically, the plaintiffs contend that the police officers, (1) lacked probable cause to make arrests, and (2) the police officers used excessive force in carrying out the arrests.[13] Thus, the plaintiffs seek to recover from the individual police officers based on § 1983 claims for false arrest and for excessive force. Both of these contentions implicate the Fourth Amendment right to be free from unreasonable searches and seizures. I will first discuss the false arrest claims, then the excessive force claims.

1.  **Probable cause**

The plaintiffs argue Officers Bergert, Carlantone, Burns, Goranitis, Williams, and Arango violated the Constitution by arresting them without probable cause. Probable cause exists where an arrest is "objectively reasonable" based on the totality of the circumstances. <u>Rankin v. Evans</u>, 133 F.3d 1425, 1435 (11th Cir.

_____

[13] Because the Fourth Amendment provides the explicit source of protection against unreasonable seizure, that Amendment and not the more generalized right to "due process" govern the constitutionality of the police conduct during arrests. <u>See</u>, <u>e.g.</u>, <u>Hamm v. Powell</u>, 893 F.2d 293, 294 (11th Cir. 1990) ("courts must analyze claims of wrongful arrest and force under the Fourth Amendment's objective reasonableness standard.") (quotation marks omitted). To the extent the plaintiffs intended to charge the police officers with violating something other than the Fourth Amendment, they have not explained or supported these claims. Specifically Fils and Maurice have not alleged any police misconduct after the arrests. <u>See</u>, <u>e.g.</u>, <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 452 (5th Cir. 1998) (Fifth and Fourteenth Amendment analysis does not begin until "*after* the plaintiff has been released from the arresting officer's custody") (emphasis in original). And the plaintiffs have not attempted to develop any race-related Fourteenth Amendment claims beyond unsupported allegations. These meritless claims are deemed abandoned.

1998). This standard is met when the facts presented to an officer "would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Id. (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)).

To raise a valid qualified immunity defense, however, a police officer need only have had *arguable* probable cause to arrest the plaintiff. Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999). Arguable probable cause means that a reasonable police officer in the defendant's position could have believed that probable cause existed at the time, even if in hindsight it turns out there was no probable cause. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Ultimately, to overcome qualified immunity the plaintiffs must present the absence of both probable cause *and* arguable probable cause--that much is clear. Rankin, 133 F.3d at 1436. Somewhat less clear is precisely where the "arguable probable cause" inquiry fits into two-part analytical framework of Saucier v. Katz.

Some Eleventh Circuit decisions in § 1983 false arrest cases have treated the "arguable probable cause" inquiry as part of Saucier step one (*i.e.*, was the arrest unlawful?). See, e.g., Skop v. City of Atlanta, 485 F.3d 1130, 1140, 1143 (11th Cir. 2007); Davis v. Williams, 451 F.3d 759, 764 n. 8 (11th Cir. 2006) ("Our inquiry focuses on the first step of the qualified immunity

analysis--whether Davis' constitutional rights were violated. There is no question that the second step--clearly established--is satisfied, as it is clearly established that an arrest made without probable cause violates the Fourth Amendment.") (citing Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir. 1998)). Under this approach, if a police officer had either probable cause or even arguable probable cause to make an arrest, then there is simply no Fourth Amendment violation and qualified immunity applies. Conversely, if the plaintiff can show (under the plaintiff's version of the facts) the absence of both probable cause *and* arguable probable cause, then the plaintiff has established a Fourth Amendment violation. Only once the plaintiff has established the absence of both probable cause and arguable probable cause does the court proceed to Saucier step two to ask, was the constitutional right "clearly established"? Under this approach--the right at issue having been defined in Saucier step one as the right not to be subjected to an arrest without even *arguable* probable cause--there is little difficulty in concluding that this right, so defined, is "clearly established." See Davis, 451 F.3d at 764 n. 8. Put differently, every reasonable police officer knows that it is illegal to arrest someone without even arguable probable cause.[14]

---

[14] This treatment of a § 1983 false arrest claim--that is, conducting the bulk of the analysis under the rubric of Saucier step one--is close to how the Eleventh Circuit deals with § 1983

Other cases in this circuit equate "arguable probable cause" with the "clearly established" inquiry in <u>Saucier</u> step two. <u>See</u>, <u>e.g.</u>, <u>Case v. Eslinger</u>, 555 F.3d 1317, 1327 (11th Cir. 2009) ("If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed. The officer may still be shielded from liability because his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotation marks omitted); <u>Poulakis v. Rogers</u>, 341 Fed. Appx. 523, 526 (11th. Cir. 2009) (unpublished opinion) (citing cases). Most recently, in <u>Poulakis v. Rogers</u>, the majority of the Eleventh Circuit panel commented extensively on the placement of the arguable probable cause inquiry, seeming to reject the <u>Davis</u> and <u>Skop</u> approach. <u>See</u> <u>Poulakis</u> 341 Fed. Appx. at 527 n. 2. Rather, <u>Poulakis</u> instructs that the first step of <u>Saucier</u> is concerned only with whether the arresting officer had *real* probable cause to make the arrest. <u>Id.</u> at 525-27. If he did, qualified

---

excessive force claims brought under the Fourteenth or Eighth Amendments (e.g., for incidents occurring after the arrest). In this category of § 1983 cases, a plaintiff can overcome a defense of qualified immunity merely by showing that his Eighth or Fourteenth Amendment rights were violated, without addressing <u>Saucier</u> step two. <u>See</u>, <u>e.g.</u>, <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009) (the Eleventh Circuit "created this rule because, for an excessive-force violation of the Eighth or Fourteenth Amendments, the subjective element required to establish [a violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution.")(internal quotation marks omitted).

immunity applies. If he did not, the court reaches Saucier step two to decide whether the illegal arrest was nevertheless excusable because the officer had "arguable probable cause"--i.e., because no pre-existing law clearly put the arresting officer on notice that his conduct was unconstitutional. Id. 527; Anderson v. Creighton, 483 U.S. 635, 641 (1987) ("law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present"). Thus, absent clearly established precedent condemning a factually similar type of arrest, a police officer can generally still claim qualified immunity based on arguable probable cause.

Under either approach, the existence of arguable probable cause is enough for qualified immunity, and the absence of arguable probable cause defeats it. Because federal courts are now free to conduct the Saucier analysis in either order, it usually won't matter where the "arguable probable cause" inquiry fits into the equation: One way or the other, the plaintiffs will be required to establish the absence of arguable probable cause for the false arrest claims to reach the jury.[15] As discussed in detail below, with respect to the § 1983 false arrest claims against Officers Bergert, Carlantone, Burns, Goranitis, Williams, and Arango, the Court finds that the defendants possessed probable cause to arrest

---

[15] This Court does not rely on cases from intermediate Florida courts in deciding whether the law was "clearly established." Thus, some of the Poulakis court's considerations about placement of the arguable probable cause inquiry are avoided. See Poulakis 341 Fed. Appx. at 527-28.

-19-

Maurice and Fils. Moreover, if the police lacked probable cause, the unlawfulness of the arrests was certainly not apparent in light of pre-existing law, <u>Valley v. Briggs</u>, 475 U.S. 335, 344-45 (1986), and they are entitled to qualified immunity. The Court will first evaluate Maurice's § 1983 false arrest claims against each of the police officers, then proceed to Fils's § 1983 false arrest claims.

     a.   *Maurice's false arrest claims*

    "Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime." <u>Skop</u>, 485 F.3d at 1137 (<u>citing</u> <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1333 (11th Cir. 2004)). Officer Bergert contends that there was probable cause to arrest Maurice for the offense of "resisting arrest without violence" under Fla. Stat. § 843.02.[16] That statute makes it a first degree misdemeanor to "resist, obstruct, or oppose any officer. . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Fla.

---

    [16] After being arrested, Maurice was charged with two crimes: resisting arrest without violence in violation of Fla. Stat. § 843.02 (a first degree misdemeanor), and the lesser offense of "disorderly conduct" in violation of Fla. Stat. § 877.03 (a second degree misdemeanor). So long as there was probable cause to arrest Maurice for any offense, the police are shielded by qualified immunity. <u>Bailey v. Board of County Comm'rs of Alachua County</u>, 956 F.2d 1112, 1119 n. 4 (11th Cir. 1992). In their summary judgment submissions, the police officers offer only that there was probable cause to arrest Maurice for violating § 843.02. The police do not rely on § 877.03 (or any statute) as an alternative basis for probable cause.

Stat. § 843.02.[17] Under both Florida and federal law, committing a
misdemeanor in the presence of a police officer creates probable
cause for arrest. See Lee, 284 F.3d at 1196 (citing Fla. Stat.
§ 901.15(1)); Atwater v. City of Lago Vista, 532 U.S. 318, 354
(2001).

    The two elements of resisting arrest without violence are:
"(1) 'the officer must be engaged in the lawful execution of a
legal duty'; and (2) 'the defendant's action, be it by words,
conduct or a combination thereof, must constitute obstruction or
resistance of that lawful duty.'" Zivojinovich v. Barner, 525 F.3d
1059, 1071 (11th Cir. 2008) (quoting N.H. v. State, 890 So. 2d 514,
516-17 (Fla. 3rd DCA 2005). "Legal duties" encompass more than just
making arrests. Id. (issuing a trespass warning and escorting
someone off hotel property are lawful executions of police duties)
(citing Jacobson v. State, 476 So. 2d 1282, 1287 (Fla. 1985)
("[S]ection 843.02. . . does not require that the officer be
attempting to arrest the suspect.")). Because the plaintiffs do not
dispute that Officers Bergert, Carlantone, Burns, Goranitis,
Williams, and Arango were engaged in the lawful execution of a
legal duty when they were securing the parking lot and generally
assisting with the arrests of Ms. Etienne and Ms. Edwards, the
Court will focus only on the second element of the resisting arrest

_____

    [17] Fla. Stat. § 843.02 has not changed since 2003, when the
arrests were made.

statute: namely, whether Maurice's actions constituted obstruction or resistance of the police officers' lawful duties.

Officer Bergert relies the declarations of fellow officers and testimony of Ms. Cienus to argue that the "resistence" element of Fla. Stat. § 843.02 is established because Maurice disobeyed police instructions and attempted to undermine police control of the crime scene. Under Florida law, "it is a crime not only to oppose or to obstruct a law officer in the execution of the officer's duty, but also to *attempt* to oppose or to obstruct the officer." <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1558-59 (11th Cir. 1993) (emphasis added), <u>modified</u>, 14 F3d 583 (11th Cir. 1994). In <u>Post</u>, a police officer made two arrests during a code-enforcement inspection of Big Louie's restaurant in Fort Lauderdale, and both arestees later filed § 1983 false arrests lawsuits. <u>Id.</u> at 1555. On the day of the incident, the owner was arrested first for having customers in excess of the restaurant's "maximum occupancy" cap of twenty-two. Second, the restaurant manager was arrested for resisting an officer in violation of § 843.02. <u>Id.</u> The district court denied the police officer's Rule 56 motion for qualified immunity and the interlocutory appeal followed. <u>Id.</u> at 1555-556. With respect to the owner, the court of appeals held that, even accepting her factual allegation that there were only twenty customers in Big Louie's, "in many circumstances a reasonable officer could believe that more than 22 customers were present, even if the actual number was 20."

Id. at 1558. The court noted the restaurant was fairly busy at the time, with crowded aisles, customers coming and going, and employees walking about. Id. Therefore, the policeman had at least *arguable* probable cause to arrest the owner, even if a more precise headcount would have revealed she had not broken the "maximum capacity" law. Id. With respect to the manager's arrest for obstruction under § 843.02, although "[b]ystanders said that [the manager] was doing nothing to interfere with the code team when he was arrested," the court noted that while the first arrest was ongoing the police officer "told [the manager] to be quiet; [the manager] repeated his instruction [to an employee] to turn the radio down," and then he was arrested. Id. at 1557. The manager obviously denied he was attempting to incite bystanders, but he "concede[d] that [he] did keep talking after [the police] told him to be quiet." Id. at 1559. Significantly, the court emphasized in a footnote that:

> On summary judgment, we accept the plaintiffs' version of
> what happened as true. But the issue again is not whether
> [the manager] did, in fact, commit acts of obstruction
> and resistance or even, in fact, attempt to do so; the
> issue material to qualified immunity is whether a
> reasonable officer in [the arresting officer's] place
> would have thought the facts were such that he could
> reasonably conclude that [the manager] was committing, or
> was about to attempt, acts of obstruction or resistance.

Id. at 1559 n. 8. In evaluating whether there was probable cause for the manager's arrest, the Eleventh Circuit found significant that a crowd was gathering and the police officer had information

that the manager lashed out against police officers in the recent past. Id. at 1559. Based on how the police officer might have perceived the situation at Big Louie's, the officer had at least arguable probable cause to believe the manager violated § 843.02.

Post is instructive in evaluating Maurice's false arrest case, because it involves the same criminal statute and there are some similarities in the fact settings. Under Maurice's version of events, he did not hear any orders to disburse, and he did not intend for Bergert to hear his obscenities about the police. But the focus of the arguable probable cause inquiry is on what a reasonable, objective policeman might have believed on the scene. From a law enforcement perspective, the parking lot was hardly a model of calmness. It is undisputed that only minutes earlier, Ms. Etienne was arrested for confronting Officer Barnes. Then Ms. Edwards immediately became violent, necessitating the use of a taser. Even as Maurice was being arrested, the women were being taken into custody a short distance away. Maurice Dep. 139-140. It is uncontested that yet another bystander was enraged by Ms. Edwards's arrest and taunted the police to "take off that badge" and meet *mano a mano*, Cineus Dep. 26, and disk jockey Bernie Jadotte had interfered with police and was arrested, id. at 94.[18]

---

[18] The Court notes that according to the plaintiffs summary judgment papers, a third woman, Ethelia Rosemane, was also arrested for disorderly conduct during the disturbance. Maurice's Resp. to Officers' Mot. for Summ. J. ¶ 22, December 24, 2008, ECF No. 188.

It was in this context that police were attempting to take control of the parking lot ordered patrons back into the club (at least according to some of the plaintiffs' witnesses). Cineus Dep. 41-45. Maurice does not and cannot deny that commands were made, only that none were directed to him.[19]

---

[19] There is testimony and some circumstantial evidence that Maurice was among those the police ordered inside, even if Maurice did not hear it. Cineus testified that the police were trying to "clear the area" and directly told Maurice two or three times to leave the scene. Cineus Dep. 41. I must note that plaintiffs' counsel, Arthur Calvin, relied extensively on Ms. Cineus's deposition testimony in opposing the defendants' motions for summary judgment, thereby urging the Court to regard Cineus as a credible witness. Cineus herself explained she had no reason to give false testimony and she likes both Fils and Maurice on a personal level. Id. at 57. Fils testified under oath about the police officer's commands at her criminal trial:

Q: So there's a possibility that somebody--the officers could have been telling everybody to go inside?
A: Probably.
Q: But you didn't hear?
A: Probably.
Q: Okay. There's a probability they told Maurice to go inside, but you didn't hear?
A: Probably.

Trial Tr. 17:12-19, Oct. 4, 2006, ECF No. 194-1. During her deposition in this case, Fils re-affirmed that the police officers "probably" told Maurice to go inside. Fils Dep. 85. (Although she also denied that the police commanded anyone to move away. See id. at 93.) Jimmy Augustine also testified in connection with Fils's criminal case. Mr. Calvin was present at the deposition and filed Augustine's deposition transcript into the record in this case as an exhibit. According to Augustine's deposition, he also heard the police give disbursal orders, saying, among other things, to "[back up or you're going to jail." Augustine Dep. 39, Feb. 5. 2004, ECF No. 204. According to Augustine, Bernie Jadotte, for one, resisted several instructions to go inside the club and was finally arrested. Augustine Dep. 40. Although the Court credits Maurice's version of disputed facts on summary judgment, the testimony from other witnesses about whether police ordered people to disburse can be considered for the limited purpose of whether the police reasonably believed Maurice was defying orders.

-25-

The case of <u>Kingsland v. City of Miami</u>, 382 F.3d 1220 (11th Cir. 2004) provides guidance as to how this Court must assess the conflicting accounts of disbursal orders. In <u>Kingsland</u>, the court of appeals reviewed the district court's qualified immunity determination in a § 1983 false arrest case. Ms. Kingsland, the plaintiff, claimed that a Miami police officer ran a red light and crashed into her truck at an intersection. <u>Id.</u> at 1223. Other Miami police officers responded and allegedly noticed signs that she was under the influence of drugs. Kingsland failed a field sobriety test and was arrested. <u>Id.</u> at 1224-225. At the police station she tested negative for drugs and alcohol, but police charged her with "DUI-cannabis" anyway. <u>Id.</u> After the charge was dropped, the plaintiff sued for false arrest and malicious prosecution. In seeking qualified immunity, the police argued that the arrest was reasonable, because they sensed Kingsland and her truck smelled like marijuana, thereby creating probable cause. <u>Id.</u> at 1223-224. In opposing summary judgment, the plaintiff accused the police of fabricating the cannabis charge because neither she nor her truck ever smelled like marijuana. <u>Id.</u> at 1227. Confronted with conflicting testimony about the cannabis odor, the trial court seemed to adjudge the plaintiff's testimony about *her* lack of body odor as irrefutable on summary judgment. But when it came to her testimony about the *truck's* odor, her denial of a cannabis smell was not enough to create a head-to-head "fact dispute" with the

-26-

police officers' perception of the odor:

> Even though [the plaintiff] did not smell of cannabis--I
> credit her version of events instead of [the
> polices']--she has no evidence to contradict the
> testimony of [the police] that there was an odor of
> cannabis from the truck.

Id. at 1227 (quoting Kingsland v. City of Miami, 2003 WL 24829644
*6 (S.D. Fla. 2003)). The Eleventh Circuit found fault in the
district court's weighing of the evidence:

> [T]he plaintiff has proffered no less evidence regarding
> the presence or absence of a cannabis odor than the
> defendants have. The plaintiff's word is merely countered
> by the defendants' testimony. . . . Therefore, the
> district court improperly accepted as true the [police
> officers'] allegation that the truck smelled of cannabis,
> and erroneously used this fact to support summary
> judgment in the defendants' favor.

Kingsland, 382 F.3d at 1227. The Kingsland court further observed
that although the police officers' "allegation that a cannabis odor
was present could potentially have been verified with direct
evidence"--such as searching or impounding the truck, using a drug
sniffing dog, or retaining the plaintiff's malodorous clothing--"it
is incongruous to expect the plaintiff to prove a negative--the
absence of an odor." Id. at 1227. In this case, Maurice's inability
to "disprove" that police officers gave disbursal orders is not
equivalent to Ms. Kingsland's predicament. There was strong
circumstantial evidence in Kingsland that the plaintiff was telling
the truth and the police were lying. Id. at 1227 ("[the police]
appear to lack any corroborating evidence to support their
testimony that an odor of cannabis was present"). Here, the

-27-

opposite is true. Officer Bergert supported his position that
Maurice was among the crowd ordered to leave with more than self-
serving testimony. Cineus and Augustine both heard multiple
disbursal orders, and Fils herself testified that Maurice was
"probably" ordered back. See footnote 20, supra. The uncontested
evidence about the ongoing disturbance in the parking lot further
corroborates the officers' story they gave disbursal orders.

Other district courts have held on summary judgment that
police officers do not act unreasonably by assuming their disbursal
orders are heard and understood by those in the affected area. See,
e.g., Owaki v. City of Miami, 491 F. Supp. 2d 1140, 1154 (S.D. Fla.
2007) (finding probable cause to arrest protester for ignoring a
police order to disburse under § 843.02, despite protester's
testimony that he never heard the order). Indeed, crowds almost
always outnumber law enforcement at large disturbances, thereby
creating a risk that potential aggressors will feel emboldened. The
risk is heightened when police are in the vulnerable position of
making a divisive arrest like the arrests of Ms. Eteinne, Ms.
Edwards, and Mr. Jadotte. In that regard, disbursal orders are
inherently over inclusive, because the threat to be extinguished is
the existence of a crowd itself, even while most of its members
might be perfectly good citizens. Requiring police to individually
engage each bystander would defeat the goal of quickly evening the
odds and establishing the appearance of police control. Thus, in

the midst of an obviously tense arrest scene, where multiple
directives are given, the police do not act against the Fourth
Amendment by making an arrest premised on the assumption their
orders are heard.

Even if Maurice were not ordered to leave, by his own
admission he stood among a crowd expressing that "these
motherfuckers are overreacting" in a voice loud enough for
bystanders and Officer Bergert to hear from several feet away (over
all the background noise, while Maurice was facing the opposite
direction).[20] According to Bergert, police had already issued

_____

[20] The Court is aware that "resisting an officer" under § 843.02
generally requires more than words. See Stamos v. Brown, 2010 WL
2985659 *2 (S.D. Fla. July 28, 2010). In Stamos, this Court relied
on the Eleventh Circuit's analysis in Davis v. Williams, 451 F.3d
759, 765 (11th Cir. 2006), a 2006 case in which a homeowner shouted
towards police parked at the bottom of his driveway. Id. at 763.
The police told him to go away more than once but he persisted and
was arrested. Id. The Eleventh Circuit wrote that § 843.02 plainly
did not criminalize the homeowner's ability to query the police
officers, because "Florida courts have generally held, with very
limited exceptions, that physical conduct must accompany offensive
words to support a conviction under § 843.02." Id. The Davis court
found significant that the homeowner never posed a threat or sought
to incite violence, did not physically obstruct the police, and
remained a safe distance away the whole time. Id. at 766. Further,
the Davis court acknowledged Florida cases in which words combined
with exacerbating factors were enough to violate § 843.02. Id. at
765-66, (citing Wilkerson v. State, 556 So. 2d 453, 456 (Fla. 1st
DCA), rev. den., 564 So. 2d 1088 (Fla. 1990); H.A.P. v. State, 834
So. 2d 237 (Fla. 3rd DCA 2002); see also Sullivan v. City of
Pembroke Pines, 161 Fed. Appx. 906, 909-910 (11th Cir. 2006)
(unpublished opinion) (probable cause to arrest under § 843.02
because plaintiff's repeated verbal interruptions during a police
investigation); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559
(11th Cir. 1993) (arguable probable cause to arrest under § 843.02
when the plaintiff had a history of outbursts towards the police
and appeared to be inciting bystanders); Zivojinovich v. Barner,

-29-

multiple commands when Maurice "began yelling obscenities at me."
Bergert Dec. ¶ 6. Maurice obviously denies that his obscenities
were aimed at the police, but he concedes he called the police
"motherfuckers" and Bergert heard ("It was loud enough for
[Bergert] to hear me, obviously." Maurice Dep. 144:4-6). See
Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008)
(assuming for purpose of probable cause inquiry that plaintiff
purposely sprayed blood on police when he spoke because "that is
how it would appear to a reasonable officer at the scene.").

In sum, there had been several outbursts from club-goers and
the police were in the process of taking people into custody. In
these circumstances, a reasonable officer in Bergert's place could
have believed Maurice's comment was made "in seeming defiance of a
police instruction [and] indicated that [the plaintiff] was
interfering or about to attempt to interfere with" police efforts
to control the situation. Post, 7 F.3d at 1559. Without doubt,
Bergert's grossly disproportionate exertion of force for a minor
§ 843.02 violation makes it harder to dispassionately reconstruct
the factual setting to conduct the highly clinical probable cause

---

525 F.3d 1059, 1063-64, 1071-72 (11th Cir. 2008) (probable cause to
arrest under § 843.02 after plaintiff twice stood up and spoke
after being told to sit down). In any event, some "physical
conduct" did accompany Maurice's words: He admits standing in front
of the arrest scene as part of a crowd that Bergert perceived to be
"gathering around the officers, causing an officer safety concern."
Bergert Dec. ¶ 4, ECF No. 155. Bergert's stated "safety concerns"
were not pretextual. Literally each time someone was arrested, at
least one other patron became agitated and confrontational.

inquiry--whether an objective officer "might have" perceived the elements of § 843.02--ignoring for the moment that Bergert allegedly executed the arrest by popping out of nowhere and firing his taser gun without warning. Still, the probable cause question must be asked: Would a prudent police officer be justified in suspecting that Maurice was committing, or attempting to commit, a violation of Florida law? The answer is yes. Viewing the facts in the light most favorable to Maurice, he has not established a violation of his clearly established rights. "Put differently," the court of appeals wrote in Post, "[the plaintiff] has not shown that the law of probable cause is so clearly established that no reasonable officer, faced with the situation before [him], could have believed that probable cause to arrest existed." Id.

Maurice has not offered any theory or factual basis for holding the other police officers liable under § 1983 for false arrest. Therefore, all the police officers are entitled to qualified immunity from Maurice's § 1983 false arrest claims.

**b. *Fils's false arrest claims***

According to her arrest affidavit, Fils was charged with battery on a law enforcement officer (Fla. Stat. § 784.07), resisting arrest with violence (Fla. Stat. § 843.01) and disorderly conduct (Fla. Stat. § 877.03). The least serious of these offenses is disorderly conduct. In their motion for summary judgment, however, the police make no mention of the disorderly conduct

offense. Instead, they rely entirely on Fils's alleged violation of § 843.01 (resisting arrest with violence) and § 843.02 (resisting arrest without violence)--the latter offense not even having been charged--as the source of the probable cause to arrest.[21]

The details of Fils's involvement in the disturbance are summarized above. At her deposition, she testified about what happened once Maurice was on the pavement surrounded by police officers:

A: I was like three feet away, standing behind the officer.
Q: Okay. So you were in a spot where the officer could not see your movements because you were behind him, correct?
A: Correct.
Q: And you were yelling and shouting at him?
A: Yes.
Q: Did you continue to approach him while you were yelling and shouting or did you stay in one spot?
A: I probably--I think I stepped forward to tell him, let him go.
Q: So you approached the officer, yelling and screaming in a position where he could not see your movements, and you were yelling at him to let go of your boyfriend, he didn't do anything, your killing him?
A: Right.
Q: How long were you yelling for?
A: Thirty seconds.
Q: Isn't it true that the officer told you to stop yelling at him and to back off?
A: No, he didn't.
Q: The officer, for the 30 seconds that you're yelling at the officer, from the position that you told me and the movements that you described to me, he never says anything to you?
A: No, he didn't say anything to me.
Q: He doesn't say, ma'am, stop yelling at me and back off?
A: No.

. . . .

_____

[21]As stated above, "the validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002).

-32-

Q: . . . . What I want to know is, did you ever initiate any physical contact with the officers?
A: No, I did not.
Q: Would you remember if you did?
A: Yes, I would.
Q: Did you ever jump on an officer?
A: No.
Q: Did you ever step on an officer?
A: No.
Q: So what happened to you after you spent the 30 seconds yelling and screaming at the officers?
A: Out of nowhere, an officer grabbed me and threw me on the floor and I end up hitting my head and my chin.

Fils Dep. 94:18-95:25, 97:3-17. In their police reports and declarations, the police portray a completely different picture of what happened, alleging that Fils jumped on Bergert's back and began hitting him. These stories are irreconcilable and one side is lying.[22] Regardless, at this stage Ms. Fils must be believed. The question, thus winnowed, is whether there was probable cause to believe Fils violated Florida law by screaming at police officers from a distance of thirty-six inches for thirty seconds as a means of protesting an ongoing arrest in the middle of a relatively volatile disturbance.

The elements of § 843.02 have been discussed at length in relation to Maurice. Even accepting Fils's claim she did not physically touch the police officers, a reasonable police officer

_____

[22]Or perhaps both sides are trying to shore up their positions. Ms. Cineus recalled quite clearly that Fils tried to physically push and wiggle into the group of police officers, and that Fils touched the police officers before Burns touched her. Cineus Dep 48-54. But Cineus denied that Fils ever kicked, punched, or became physically aggressive towards anybody. Id.

-33-

could perceive Fils's undisputed conduct was an attempt to obstruct the arrest of Maurice. In fact, preventing Maurice's arrest--or at least attempting to influence how the police officers conducted the arrest--was Fils's stated objective. She believed Maurice was innocent, and that the police were misbehaving. Indeed, she might have been correct; the jury in this case will decide. But the recourse for perceived police misconduct is not obstruction.

Fils's admitted conduct is enough to sustain a finding of probable cause for her arrest under § 843.02. Whether she was protesting in words alone or words plus a "physical obstruction" (because of her extremely close position) is immaterial, because "[w]ords alone may result in obstruction of justice where the officer in question is. . . legally detaining a person." Francis v. State, 736 So. 2d 97, 99 (Fla. 4th DCA 1999).[23] Fils has not given any reason for holding any of the police officers liable under § 1983 for false arrest. Therefore, all the police officers are entitled to qualified immunity on Fils's § 1983 false arrest claim.

## 2. **Excessive force**

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284

---

[23] Even if Bergert's arrest of Maurice were "unlawful," there is no suggestion that Officer Carlantone's *perception* that Fils's was interfering with a lawful arrest was objectively reasonable (whether or not it was lawful in fact).

F.3d at 1197 (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). The Supreme Court instructs that the use of force must be judged on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "To balance the necessity of the use of force. . . against the arrestee's constitutional rights, a court must evaluate several factors, including '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" Vinyard, 311 F.3d at 1347 (quoting Graham, 490 U.S. at 396). The "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008).

If the plaintiffs can demonstrate a Fourth Amendment violation under step one of Saucier v. Katz, they must also show that the law was clearly enough established at the time of the violation to give the officers "fair warning" their alleged treatment was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741 (2002). In a claim of excessive force, there are two ways to show that the law clearly established. Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002). The first is to show that, in a materially similar factual situation, the law has held that the officer's conduct was unlawful. Id. Where the case law is not materially similar, courts

-35-

look to the second way and consider whether other precedent has provided sufficient notice to "every" reasonable officer that such force is unlawful. Id. at 1199 (citation omitted). In this latter category, it is said that broader, clearly established principles might so obviously apply to novel facts that police have "fair warning" that certain force is unconstitutional even without specific case law. See Hope, 536, U.S. at 741.

### a. *Maurice's excessive force claims*

Taking the facts in the light most favorable to Maurice, Officers Bergert and Williams used excessive force in arresting Maurice. Under Maurice's version, Bergert had no reason to use a taser. Each Graham factor supports Maurice. First, Maurice was not arrested for a serious crime. Second, Maurice apparently did not pose an immediate threat to anyone's safety. Third, under Maurice's account of the facts, he was cooperative, was not resisting arrest, not attempting to flee, and he never disobeyed any direct orders that were made to him. In the moments before he was tased, Maurice was standing near the club entrance with Jimmy Augustine monitoring the admittance of club-goers. The two men were telling people, get in or get out, but don't linger around the entrance. When Maurice turned around and saw Bergert with his taser drawn, Maurice raised his hands and stepped back, presumably ready to comply with

-36-

whatever Bergert instructed.[24] Bergert never told Maurice he was under arrest or asked him to surrender. He simply decided to shoot first, ask questions later, at least according to Maurice's story (which will be challenged at trial).[25]

Despite the plaintiffs' failure to cite pre-existing precedent condemning tasers in these circumstances, the Court finds that searching for fact-specific "taser cases" is unnecessary. Several well-known, pre-2003 Eleventh Circuit decisions concerning attack dogs and pepper spray had already announced a fundamental rule governing gratuitous force that would have encompassed this situation. In Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000), the court of appeals considered whether it was clearly established (as of 1994) that it was excessive force to attack a submissive burglar with a police K-9. Id. The plaintiff was suspected of a minor burglary and immediately surrendered once

---

[24] The Court notes that even accepting Cineus's version of the facts, Bergert's resort to the taser was unwarranted. Cineus testified that Maurice exchanged words with Bergert, to the effect that Maurice was affiliated with the party and "on their side." Cineus recalled Bergert tried to push Maurice and others inside the club, but the entrance was physically blocked because of patrons packed around the door. According to Cineus, it would have been impossible for Maurice to comply with Bergert's instructions because the entrance was impassable. Further, Cineus testified that Maurice was cooperative and did not refuse any orders from the police.

[25] Bergert claims he gave "multiple directives to Nemours Maurice to leave, however, he did not comply. . . . Mr. Maurice began yelling obscenities at me. . . . I attempted to take Mr. Maurice into custody, however, because Mr. Maurice was non-compliant he had to be tased." Bergert Dec. ¶ 7, ECF No. 155.

-37-

he was discovered. Accepting the burglar's allegations, he did not pose a threat to anyone. Id. Nevertheless, the police officer unleashed his dog to bite the plaintiff for two painful minutes. Id. The Eleventh Circuit held that amount of force was so disproportionate that the plaintiff was excused from citing cases condemning this kind of K-9 attack. "Although the clearly-excessive-even-in-absence-of-case-law standard is a difficult one to meet, we think that, on the facts of this case, the law was clearly established. . . that what [the policeman] did violated Plaintiff's constitutional rights." Id. Similarly, in Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002), although the Eleventh Circuit could not locate a controlling pre-1998 decision about the use of pepper spray, the court held that courts in other jurisdictions had "consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else."

Although there are no allegations in this case about whether "tasing" should be regarded as greater or lesser force than, for example, pepper spray, Priester and Vanyard demonstrate that fact-specific precedent is not necessary for police officers to know that gratuitous use of a weapon against a submissive, non-threatening subject violates the Fourth Amendment, regardless of

-38-

the specific weapon.[26] Even in the absence of "taser" precedent, the
law was clear in 2003 that a police officer in Bergert's position
was not permitted to walk up to a cooperative misdemeanor suspect
and use substantial force without verbally engaging the suspect.
Bergert delivered at least one more shock to Maurice's neck when
Maurice was on the ground. The Court emphasizes that Maurice's
crime consisted (at most) of disobeying a general disbursal order
and uttering an obscenity, he was not given verbal warnings or
direct instructions before he was tased, he posed no specific
threat to anyone, and there were numerous police officers on the

---

[26] The Court notes several Eleventh Circuit opinions discussing
the pre-2003 legal landscape on tasers (all them issued after
Maurice's arrest). In Draper v. Reynolds, 369 F.3d 1270, 1278 (11th
Cir. 2004), the court reviewed a taser incident that happened
during a 2001 traffic stop, holding that it was not excessive force
to use a single taser discharge to subdue a "hostile, belligerent,
and uncooperative" man who refused numerous verbal commands, even
without first attempting to "verbally arrest" the subject. Id.
Because the force was not excessive, the court did not consider the
"clearly established" prong. In Moretta v. Abbott, 280 Fed. Appx.
823, 824-825 (11th Cir. 2008) (unpublished), police officers used
a taser in August 2003 to arrest a troubled six-year-old schoolboy
holding a piece of broken glass on school property, even though the
boy was sitting in a trance-like state and presented no threat to
anyone. The Eleventh Circuit held there was "obvious clarity" that
the tasing violated the Fourth Amendment, even without factually
similar case law. Id. at 825. By contrast, in Chaney v. City of
Orlando, 291 Fed. Appx. 238, 242 (11th Cir. 2008) (unpublished),
the court found that a June 2003 tasing was not excessive force
because the suspect had physically opposed police instructions
during a traffic stop and ultimately ended up in a roadside tussle
with the police officer, who finally used a taser out of "fear of
losing control." The court held that Chaney was not an "obvious
clarity" case, and, secondly, the plaintiff did not cite
controlling law "which would have provided [the police officer]
with notice that use of a Taser constituted unreasonable or
excessive force." Id. at 244.

scene.[27] Thus, while there was a measure of probable cause for Bergert to believe Maurice violated or was attempting to violate the law, the manner in which Bergert performed the arrest violated the Fourth Amendment, and Bergert should have known this at the time. Maurice has also sufficiently alleged an excessive force claim against Officer Williams, who fired a second taser probe into Maurice's rib cage. Maurice admits that he did not fall down immediately after the first tase (because his body tensed up and his legs locked), but he denies swinging his arms or presenting any aggressive movements or struggle towards Bergert. In addition, by some accounts Maurice was already on the ground when Williams came in, Cineus Dep. 84:5-6, and Maurice had already been shocked twice. Thus, the allegations are sufficient for the jury to decide whether Officer Williams should have fired a second taser, or whether he was in a position to prevent Bergert from grinding his taser into Maurice's neck and applying a contact tase. See Maurice Dep. 149. Maurice has not explained how Officers Carlantone, Burns, Goranitis, or Arango committed excessive force violations, nor has

---

[27]In McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003) (opinion dated June 13, 2003), the Eleventh Circuit held it was not excessive force to use pepper spray before verbally or visually engaging a suspect. In McCormick, however, the suspect was an apparent violent felon with a weapon and the policeman was alone. I suspect the McCormick court would require a warning in Maurice's case.

Maurice argued that these officers failed to intervene.[28]

Accordingly, Bergert's and Williams's motions for summary judgment on qualified immunity on Maurice's § 1983 excessive force claim are denied. Officer Carlantone, Burns, Goranitis, and Arango's motions for summary judgment on Maurice's excessive force claim are granted, because they are entitled to qualified immunity under Saucier v. Katz.

### b. *Fils's excessive force claims*

Fils also claims that the six police officers used excessive force in carrying out her arrest. Once again, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." Thornton v. City of Macon, 132 F.3d at 1400 (citing Graham v. Connor, 490 U.S. 386, 394 (1989)). Fils was not suspected of a serious crime, and, so far as it appears, posed no threat to anyone. She admittedly shouted at the police for thirty seconds at fairly close range, but she denies being told to stop or back away. Yet, on the facts viewed in the light most favorable to Fils, without any

---

[28] To be liable for failure to intervene, the defendant officer must have had a legitimate opportunity to intervene. Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998); Carr v. Tatangelo, 338 F.3d 1259, 1274, n. 27 (11th Cir. 2003). There is no evidence that other officers were in a position to intervene or, for that matter, knew that Bergert's and William's use of force was unwarranted. Further, in his deposition, Maurice specifically disclaimed that these officers used force against him. Maurice Dep. 152-53. The Court need not explore theories of liability that plaintiffs' counsel did not bother to develop.

-41-

prompting whatsoever, Burns slammed her into the ground hard enough to knock her unconscious. Cineus heard Fils's skull thud against the pavement. Cineus Dep. 91. Under the circumstances, with numerous police officers on the scene, it would be clear to any prudent officer that this level of force was a serious overreaction to Fils's verbal protestations. Though Fils was undoubtably loud and annoying for those thirty seconds, the fact that she did not physically touch any of the policemen the whole time was strong evidence that she was all bark and no bite. A reasonable policeman would have warned Fils--or at least attempted to do so--before resorting to significant force. The Eleventh Circuit has cautioned that, "[i]n analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." Garrett v. Athens-Clarke County, Ga., 378 F.3d 1274, 1280 (11th Cir. 2004). Here, there was nothing but a "tail of the story": Fils shouted until Burns spontaneously slammed her to the ground. Therefore, viewing the plaintiffs' version of the facts, the Court must deny Officer Burns's motion for summary judgment on qualified immunity with respect to Fils's excessive force claim. Several of the police reports indicate that Bergert applied a contact tase against Fils's upper chest before or during her arrest. See Ex. A, Parts 1-6, to Ribel's Concise Statement of Material Facts, ECF No. 140. Fils does not remember being shocked, and the plaintiffs' pleadings are

-42-

silent. Maybe Bergert tased her after she lost consciousness. Nonetheless, Fils does name Bergert as a defendant to her excessive force claim, and alleges in Count V that he abused her and committed an unreasonable seizure. Although the plaintiffs themselves failed to present facts supporting this claim, I cannot ignore the undisputed facts on the record. Accepting Fils's story as true, a prudent officer would not have tased her merely for shouting. Bergert's motion for summary judgment as to Fils's excessive force claim is denied.

No other officer participated in the excessive force against Fils, and none had a chance to intervene, because the application of force was apparently unanticipated and over in an instant. By the time Carlantone or others came over, the deed was done. Apart from Barns and Bergert, the other police officers are entitled to qualified immunity on Fils excessive force claim.

## B. State law claims against the police officers

### 1. Maurice's and Fils's false imprisonment claims

Relying on the same facts that supported their § 1983 claims, Maurice and Fils allege in Counts I and II that all six police officers falsely arrested and imprisoned them. The torts of false arrest and false imprisonment are virtually identical under Florida law, if not the same.[29] Card v. Miami-Dade County, Florida, 147 F.

---

[29] Some Florida courts have concluded that they are different labels for the same cause of action. See, e.g., Weissman v. K-Mart Corp., 396 So. 2d 1164, 1165 n. 1 (Fla. 3d DCA 1981). Others have

Supp.2d 1334, 1347 (S.D. Fla. 2001). Both actions are defined as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." <u>Escambia County School Bd. v. Bragg</u>, 680 So. 2d 571, 572 (Fla. 1st DCA 1996). However, as under federal law, the existence of probable cause bars a claim under Florida law for false arrest and false imprisonment. <u>See</u> <u>Von Stein v. Brescher</u>, 904 F.2d 572, 584 n. 19 (11th Cir. 1990) (noting that, in Florida, existence of probable cause disposes of state law claim for false arrest); <u>Mas v. Metro. Dade County</u>, 775 So. 2d 1010, 1011 (Fla. 3rd DCA 2001) ("[P]robable cause is a complete bar to an action for false arrest and false imprisonment."). Because the evidence shows the police had probable cause to arrest both plaintiffs, the police officers are entitled to summary judgment on the plaintiffs' state-law claims for false imprisonment in Counts I and II.

## 2.   <u>Maurice's malicious prosecution claim</u>

In Count XXII Maurice contends that the police officers are liable for the state-law tort of malicious prosecution. To state a cause of action for malicious prosecution under Florida law, a plaintiff must allege the following six elements:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued;

---

found that false imprisonment is a broader common law tort and that "false arrest is only one of several methods of committing false imprisonment." <u>Mathis v. Coats</u>, 24 So. 3d 1284, 1289 (Fla. 2nd DCA 2010).

-44-

(2) the present defendant was the legal cause of the
original proceeding against the present plaintiff as the
defendant in the original proceeding; (3) the termination
of the original proceeding constituted a bona fide
termination of that proceeding in favor of the present
plaintiff; (4) there was an absence of probable cause for
the original proceeding; (5) there was malice on the part
of the present defendant; and (6) the plaintiff suffered
damage as a result of the original proceeding.

Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355

(Fla. 1994). "The failure of a plaintiff to establish any one of

these six elements is fatal to a claim of malicious prosecution."

Id. at 1355. Maurice has not alleged (nor could he establish) the

third element of the tort--that his criminal case ended in a

favorable termination. A "bona fide termination" of the proceedings

has been described as:

a fancy phrase which means that the first suit, on which
the malicious prosecution suit is based, ended in a
manner indicating the original defendant's (and current
plaintiff's) innocence of the charges or allegations
contained in the first suit, so that a court handling the
malicious prosecution suit, can conclude with confidence,
that the termination of the first suit was not only
favorable to the defendant in that suit, but also that it
demonstrated the first suit's lack of merit.

Cohen v. Corwin, 980 So. 2d 1153, 1155-1156 (Fla. 4th DCA 2008)

(quoting Doss v. Bank of Am., N.A., 857 So. 2d 991, 994 (Fla. 5th

DCA 2003)). Whether a voluntary dismissal qualifies as a bona fide

termination of the proceedings "depends upon the reasons and

circumstances underlying the dismissal." Id. (citing Union Oil of

Cal. Amsco Div. v. Watson, 468 So. 2d 349, 353-55 (Fla. 3d DCA

1985). "Where dismissal is on technical grounds, for procedural

-45-

reasons, or any other reason not inconsistent with the guilt of the accused, it does not constitute a favorable termination." Watson, 468 So. 2d. at 353. Rather, only where a dismissal is of such a nature "as to indicate the innocence of the accused" does a favorable termination exist. Cohen v. Corwin, 980 So. 2d at 1156 (quoting Watson, 468 So. 2d. at 353-354).

In presenting Maurice's malicious prosecution claim against the police officers in Count XXII, plaintiffs' counsel conspicuously fails to allege the third element of the tort: that there was a bona fide termination of Maurice's original proceeding. Maurice's claim is therefore inadequately pled and must be dismissed. Even if the claim were properly pled, the police officers are entitled to judgment as a matter of law, because the plaintiffs do not dispute that the state attorney's dismissal of Maurice's criminal case was conditioned on his agreement to pay a fine, take anger management classes, and perform community service. In that regard, Maurice's criminal proceedings resulted in a termination suggesting that the charges had merit, not the other way around. This is not a favorable termination. The police officers' motion for summary judgment as to Count XXII is granted.

## 3. Fils's malicious prosecution claim

In Count XXI, Fils alleges the police officers acted with malice in initiating the criminal prosecution without probable cause, in violation of Florida law. The existence of probable cause

for the arrest contradicts the malicious intent element. <u>Wood v.</u> <u>Kesler</u>, 323 F.3d 872, 884 (11th Cir. 2003). Florida law acknowledges that probable cause is a "fluid concept" that deals in probabilities, not certainties, and allows officers to reach common sense conclusions. <u>See</u> <u>State v. Catt</u>, 839 So. 2d 757, 759 (Fla. 2nd DCA 2003) (citation omitted). "[P]robable cause exists when the circumstances are sufficient to cause a reasonably cautious person to believe that the person [arrested] is guilty of a criminal offense." <u>Daniel v. Village of Royal Palm Beach</u>, 889 So. 2d 988, 990 (Fla. 4th DCA 2004) (citation omitted). The undisputed facts establish there was probable to arrest Fils for violating Fla. Stat. § 843.02, as discussed above. This deficiency in her malicious prosecution claim, among others, is sufficient to grant the police officers' motion for summary judgment as to Count XXI.

4. **Maurice's and Fils's battery claims**

The police officers have also moved for summary judgment on the plaintiffs' Florida-law battery claims in Counts XXIII and XXIV. Under Florida law, a presumption of good faith traditionally attaches to an officer's use of force in making a lawful arrest, and the officer is liable for damages only when the force used is clearly excessive. <u>See</u> <u>Jennings v. City of Winter Park</u>, 250 So. 2d 900 (Fla. 4th DCA 1971). If excessive force is used in an arrest, "the ordinarily protected use of force by a police officer is transformed into a battery." <u>City of Miami v. Sanders</u>, 672 So. 2d

-47-

46, 47 (Fla. 3rd DCA 1996). A battery claim for excessive force is analyzed by focusing on whether the amount of force was reasonable under the circumstances. Id. (citing Dixon v. State, 132 So. 684 (Fla. 1931)). Although a police officer is provided a complete defense to an excessive force claim when he "reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest," City of Miami v. Sanders, 672 So. 2d at 47, a jury question is created by a police officer's use of arguable excessive force while effectuating an arrest. City of Homestead v. Suarez, 591 So.2d 1125, 1125 (Fla. 3d DCA 1992).

In light of the Court's findings above that Officers Bergert, Williams, and Burns used arguably excessive force in this case, summary judgment is inappropriate as to these three officers. The plaintiffs have not identified any material fact disputes that would prevent the Court from granting the remaining officers' motion for summary judgment on the battery claims. Accordingly, Officers Carlantone, Goranitis, and Arango's motion for summary judgment as to Counts XXIII and XXIV is granted.

## C. Section 1983 claims against Chief Ribel and the City of Aventura

### 1. Maurice's and Fils's official capacity claims against Chief Ribel

Maurice asserts claims against Aventura Chief of Police Thomas Ribel in his "official capacity" for, (1) knowingly hiring and retaining dangerous and/or racist police officers (Count XVIII),

-48-

and (2) failing to properly train and discipline the officers beneath him (Count XX). Fils asserts identical claims against Ribel in his official capacity in Counts XVII and XVIV.

Chief Ribel contends that the "official capacity" § 1983 claim should be dismissed as duplicative of the suit against the City of Aventura. Section 1983 claims against a chief of police in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n. 55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). In this case "official capacity" claims against Ribel in Counts XVII - XX are duplicative of the § 1983 municipal liability claim against the City of Aventura, also asserted in Counts XVII - XX.[30] Therefore, the official capacity claims against Chief Ribel are properly dismissed. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991).

---

[30] To be clear, the charges in Counts XVII - XX are directed toward three defendants: (1) Chief Ribel in his official capacity, (2) Chief Ribel in his individual capacity, and (3) the City of Aventura.

## 2. **Maurice's and Fils's individual capacity claims against Chief Ribel**

Maurice asserts claims against Chief Ribel in his "individual capacity" for, (1) knowingly hiring and retaining dangerous and/or racist police officers (Count XVIII), and (2) failing to properly train and discipline the officers beneath him (Count XX). Fils asserts identical claims against Ribel in his individual capacity in Counts XVII and XVIV. Although asserted in separate counts, the plaintiffs' claims against Chief Ribel present the exact same allegations and are appropriately analyzed together.

On December 8, 2008, the plaintiffs filed into the record [ECF No. 176] a list of the 15 exhibits they relied upon in opposing the four summary judgment motions.[31] Later, the plaintiffs supplemented the record with three other exhibits: the plaintiffs' arrest affidavits [ECF No. 182] and the transcript from Fils's criminal trial [EFC No. 194]. Of the eighteen exhibits, fifteen pertain to what happened in the Broadway Billiards parking lot on August 23, 2003 (i.e., they are testimony or reports from eye witness). The remaining three exhibits specifically pertain to the § 1983 claims against Chief Ribel and the City of Aventura. For the purpose of creating a record, I will first summarize these three submissions, all of which seek to demonstrate that Bergert was a bad cop.

---

[31] The exhibits were initially delivered to the Court in hard copy, then filed into the electronic record on February 10, 2009 [ECF No. 204].

-50-

The first is a thirteen-paragraph declaration from Barney Cumming, a former Aventura police sergeant who participated in monthly supervisors' meetings with Chief Ribel and others from 2000 to 2004. Cumming Dec. ¶¶ 3-6, Dec. 4, 2008, ECF No. 204-23. Cumming claims that on several occasions he and others "expressed concerns over the unprofessional behavior of several officers including Ofc. Sean Bergert and Ofc. Jeffrey Burns." Id. at ¶ 7. In Cumming's opinion, those two "routinely overreached their legal authority" and influenced younger policemen to do the same. Id. at ¶ 8. Prior to making his declaration, Cumming reviewed Bergert's August 23, 2003 arrest affidavit for Nemours Maurice and found Bergert's factual description of what happened to be a rehashing of generic allegations used by police officers "where probable cause must be fabricated where inappropriate or excessive force was utilized to effect and [sic] arrest." Id. at ¶¶ 10-11. Cumming states that Ribel personally reviewed daily arrests reports so he must have been privy to the generic language police officers use to "fabricate[] circumstances in arrest affidavits." Id. at ¶ 13.

The second pertinent exhibit is a twelve-paragraph declaration from Robert Borgmann, a sergeant in the Miami Police Department who had a run-in with Bergert in 1995 while Bergert was working a beat in the Indian Creek Police Department. Borgmann Dec. ¶¶ 2-4, Dec. 7, 2008, ECF No. 204. Borgmann was a passenger on a boat that was boarded by a different Indian Creek Police officer. Id. at ¶ 6.

Bergert responded to the investigation on land where the boat was detained, at which point Mr. Borgmann "observed Officer Bergert remove old beer cans stowed away as trash"; Bergert then "arranged and photographed the cans on the deck of the vessel creating the appearance of illegal consumption of alcohol." Id. at ¶ 8. Borgmann believes that Bergert "has a reputation for unprofessional, unethical, and illegal conduct." Id. at ¶ 11. Finally, he points out that Bergert's "membership in the Police Benevolent Association was permanently revoked." Id. at ¶ 12. Some of Borgmann's statements are misleading. At his deposition, Borgmann acknowledged that police often remove evidence like beer cans from coolers and so forth to get an accurate inventory of the items. Borgmann Dep. 38-41, Sept. 28, 2007, ECF No. 142-2. Nevertheless, Borgmann believes that, "the way it was done, the unprofessionalism that was done, it's obvious that Bergert was up to no good." Id. at 41.[32] Notwithstanding Borgmann's hunch there was foul play, he admits Bergert never misrepresented in any police report, affidavit, or deposition that the beer cans came from anyplace other than the trash. Id. at 42. Finally, with respect to Bergert's ban from the Police Benevolent Association (PBA), Borgmann's declaration fails to mention that it was Borgmann

---

[32] Part of Borgmann's feeling of "unprofessionalism" seemed to do with the indignity of being searched by a fellow police officer on a waterway where--in Borgmann's opinion--the Indian Creek Police Department lacked jurisdiction. Borgmann Dep. 16-17.

-52-

himself (a PBA board member) who orchestrated Bergert's dismissal from the union, because Bergert tried "to get the PBA removed from Aventura's bargaining unit and FIU Pennsylvania brought in." Id. at 44. In other words, Bergert broke PBA rules by campaigning for a different union, resulting in his ejection. Id. at 45-46.[33] This is hardly scandalous stuff.

Finally, the plaintiffs submitted the transcript from what appears to be a voir dire or evidentiary hearing (the plaintiffs have not explained) taken in connection with a case captioned, State of Florida v. Nemours Maurice, during which former Aventura police officer James McVay answers question about his experiences with Bergert. See McVay Hr'g Tr., July 23, 2007, ECF No. 204-22. McVay was a sergeant above Bergert until he was demoted to patrolman and eventually left the Aventura Police Department in 2001. The several incidents he remembered were: (1) a shop clerk from Aventura Mall once called to report that Bergert flirted with her while he was responding to a disturbance (id. at 23); (2) Bergert once sought permission to leave an off-duty assignment eight minutes early, but McVay suspects Bergert actually left closer to twenty-three or twenty-five minutes early (id. at 27); (3) Bergert's name came up in a supervisors' meeting (as described

---

[33] Even assuming Borgmann's opinions carried any significance in establishing Ribel's or Aventura's § 1983 liability, his admitted "beef" with Bergert (Borgmann Dep. 44) would cause some apprehension about his credibility.

in Cumming's declaration), and it seemed as though "everybody piped in" (id. at 36); (4) McVay felt that the "rumor mill" perceived Bergert as "a person with low character" (id. at 46); (5) Bergert once attempted to carry pepper spray on his belt to an off-duty assignment where McVay felt pepper spray would be inappropriate because it was an enclosed space (id. at 24-26); and, (6) once while Bergert was getting dressed in the locker room before his shift, he said something like, "[w]ell it's time to go fuck with the niggers at the theater." Id. at 23. With respect to the alleged racist comment, McVay never reported it, though he claims years later he mentioned it to Chief Ribel during his exit interview. McVay Dep. at 47-48, Nov. 27, 2007, ECF No. 142-5. By contrast, the one time McVay did notify Ribel about a racist comment (made by a different police officer), Ribel initiated an investigation. McVay viewed Bergert's racist comment as being "very ignorant" but McVay did not take it seriously or believe Bergert actually intended to harass anyone. Id. at 64-65. Finally, McVay was not aware of any information that Bergert ever used excessive force, and McVay had no information Ribel ever ignored reports of excessive force or unwarranted taser use. Id. at 48-50, 62.

Having summarized the plaintiffs' key evidence in support of Ribel's liability, I will now address the qualified immunity issues. The qualified immunity test for supervisors sued in their individual capacity is the same as the test for individual police

-54-

officers: If a favorable view of the plaintiffs' submissions establishes that Chief Ribel violated the plaintiffs' constitutional rights, the Court must then determine whether the right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001). A police chief is not liable under § 1983 solely on the basis of respondeat superior or vicarious liability. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). Nonetheless, even if a supervisor does not personally participate in an alleged constitutional violation, the supervisor may still be liable for the unconstitutional acts of subordinates if "there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Id. "A causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so,' or when the supervisor's improper 'custom or policy. . . resulted in deliberate indifference to constitutional rights.'" Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Fla. Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998).

In the complaint, the plaintiffs accuse Ribel of condoning a variety of shocking and transgressive activities. For example,

-55-

Ribel allegedly encouraged racist and abusive attitudes, and allowed his subordinates to engage in "taser competitions" to see who could do the most damage.[34] The plaintiffs apparently either abandoned these allegations or simply failed to corroborate them with a scintilla of evidence. With respect to the claim that Ribel exhibited deliberate indifference to hiring and retaining police officers, the plaintiffs have not proffered a single complaint by a citizen or fellow policeman against Bergert (or any other officer) regarding excessive force or racially-motivated misconduct--much less a complaint that Ribel ignored. The rumors and anecdotes offered by Cumming, Borgmann, and McVay fall short of portraying Bergert (or any Aventura police officer) as someone whom Ribel should not have hired or retained. According to Ribel's uncontested affidavit, Bergert (like all job candidates), was given a given a thorough background check before he was hired, which included: checking his prior employment and personnel files, speaking with his neighbors and references, and giving him a psychological evaluation, polygraph, and drug test. Ribel Aff.

---

[34] According to the complaint--much of which is cut-and-pasted into the plaintiffs' summary judgment submissions without citing evidentiary support--Ribel allegedly knew about "racist incidents" but did nothing (Comp. ¶ 32); hired and retained Bergert despite Bergert's "abusive behavior" at the Indian Creek Police Department (id. at ¶ 36) and Bergert's "propensities [to engage in] physically violent activities towards individuals of the African American race" (id. at ¶ 34); and knew about "taser competitions" and the falsification of police reports by the officers on Bergert's shift (id. at ¶¶ 40-43).

¶ 11, Sept. 11, 2008, ECF No. 141-5. Bergert was clean:

> Bergert had absolutely no history of sustained
> disciplinary investigations, no history of using
> excessive force and there was no background of him,
> whatsoever, to suggest that he violated the policies at
> his prior department. In fact, his Chief of Police,
> Leonard Matarese, at Indian Creek gave him a glowing
> recommendation.

Id. at ¶ 4. Ribel never received information about excessive force

or misconduct toward African Americans, and Ribel denies--without

contradiction from the plaintiffs--that sort of misconduct occurred

while he was chief. Id. at ¶ 5, 6, 12. Ribel points out that his

department did not tolerate racism: When McVay once reported a

racist comment by a fellow officer (made during a K-9 training

drill), Ribel "immediately [opened] an internal affairs

investigation regarding this issue," which revealed McVay's

allegation was unfounded. Id. at ¶ 7.

With respect to the second claim against Ribel (failure to

train/supervise/discipline), the plaintiffs have not presented a

pattern (or, for that matter, even a single instance) of excessive

force, racially-motivated misconduct, or falsification of police

reports by any Aventura police officer, much less an instance where

this kind of conduct went unpunished. Ribel's summary judgment

evidence amply rebuts the unsupported failure to train/supervise/

discipline-type allegations in the plaintiffs' complaint. For

example, Lieutenant Michael Bentolila provides an affidavit in

which he discusses at length the Aventura Police Department's

policies on taser use and training. Bentolila Aff. ¶¶ 3-8, Sept.
10, 2008, ECF No. 141-2. The City of Aventura (unlike many
jurisdictions, apparently) self-initiates an investigation of each
taser incident regardless of whether there is a citizen complaint.
Id. at ¶ 7. Specifically, since 2000 (when tasers were introduced
to Aventura) the City has required police officers to complete a
"Response to Resistance Report" after each taser incident. Id. at
¶ 5. Police Department authorities then:

> collect the tasers of every officer on the scene--even
> those officers who denied using it--and download the
> information from their Tasers into the computer system.
> The computer would then reveal the date, time, and
> duration of each Taser's discharge, if any, so that the
> Department could monitor and verify that the officer's
> report was consistent with the computer printout from the
> device.

Id. at ¶ 5. Lieutenant Bentolila proudly points out that Florida
citizens on a committee of the Dade County State Attorney's Office
commended Aventura for having an exemplary taser policy, and
Bentolila has been invited to Tallahassee to help formulate a taser
policy with the Florida Department of Law Enforcement. Id. at ¶ 6.[35]
Significantly, Bentolila states that not one of the police officers
sued in this case has had a single founded excessive-force
complaint or citizen complaint lodged against him; per municipal

---

[35] In one instance when an Aventura police officer was found to
have discharged his taser without completing the appropriate
reports, the City suspended him without pay for two weeks (even
though there was no dispute that his taser use, if properly
reported, would have been appropriate). Bentolila Aff. ¶ 8.

policy, citizens' complaints result in an Internal Affairs investigation, and any officer found to have violated department policy is disciplined. Id. at ¶ 9. Based on the evidence, this policy seems to be fairly effective. Chief Ribel confirms Bentolila's assertions, adding that the plaintiffs' allegation about a "taser competition" is false, because all taser discharges are computer-recorded and analyzed, making it impossible for an individual officer to cover up his taser use. Ribel Aff. ¶¶ 8-9. Ribel also denies knowing about any instance in which Bergert fabricated police reports or made a false arrest. Id. at ¶ 5, 12.

In short, there is no substance to the plaintiffs' claim that Ribel's failure to screen, train, supervise, or discipline Aventura police officers amounted to deliberate indifference to the rights of Aventura citizens. See Belcher v. City of Foley, 30 F.3d 1390, 1397 (11th Cir. 1994). Further, the plaintiffs have not even attempted to meet their additional burden of showing that "the state of the law. . . gave [Ribel] fair warning" that his actions were unconstitutional. Hope v. Pelzer, 536 U.S. at 741. Thus, Chief Ribel, in his individual capacity, is immune from the plaintiffs' § 1983 charges in Counts XVII - XX; his motion for summary judgment is granted.

3.  **Maurice's and Fils's § 1983 claims against the City of Aventura**

Maurice asserts § 1983 claims against the City of Aventura for implementing constitutionally deficient practices for: (1) hiring

-59-

and retaining police officers (Count XVIII), and (2) training, supervising, and disciplining police officers (Count XX). According to Maurice, the municipal policies were the moving force behind the constitutional torts perpetrated by Officers Bergert, Carlantone, Burns, Goranitis, Williams, and Arango at Broadway Billiards. Fils asserts identical claims against the City of Aventura in Counts XVII and XVIV.

The City of Aventura seeks qualified immunity because the plaintiffs fail to explain how the City deprived them of a federally protected right. A municipality is not vicariously liable under § 1983 for the act of an employee. See Monell, 436 U.S. at 691, 694. Aventura can be liable under § 1983 only if there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). Ordinarily, no single incident establishes a municipal policy or custom.[36] See City of Oklahoma City v. Tuttle, 471 U.S. 808, 821 (1985); Grech v. Clayton County, 335 F.3d 1326, 1330, n. 6 (11th Cir. 2003).

---

[36] A "policy" is a decision that is "officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). A "custom" is a practice that is "so settled and permanent that it takes on the force of law," id., that is "shown through the repeated acts of a final policymaker for the county," Grech v. Clayton County, Ga., 335 F.3d 1326, 1329 (11th Cir. 2003).

As discussed in relation to Chief Ribel, the plaintiffs allege the City of Aventura maintains grossly inadequate policies and practices governing the hiring, training, and supervision of police officers.[37] For Aventura to be held liable, plaintiffs must present evidence that, first, the municipal policies are, in fact, constitutionally infirm; and second, Aventura knew about it. For the purpose of analyzing Maurice's and Fils's claims, the crucial question is, did Aventura *know* of a need to screen and/or train and/or discipline its police officers in a particular area, but deliberately chose not to take any action? See Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). The plaintiffs insist their evidence (consisting primarily of the statements of Cumming, Borgmann, and McVay) proves Aventura knew that its lax policies allowed a culture of racism and violence to fester within the police department. Unfortunately, even considering the plaintiffs' evidence in the most favorable light, their best case is insufficient to create a genuine issue about the City of Aventura's liability for Maurice's and Fils's injuries. In particular, there is insufficient evidence to establish that the City of Aventura had notice that its municipal policies were *causing* Fourth Amendment abuses. Aventura's lack of notice is hardly surprising, since the

---

[37] Although the plaintiffs do not specifically identify what additional training is necessary, presumably they refer to training about taser use, racism, false arrest, and being truthful on police reports.

evidence on the record suggests that its practices concerning the hiring, training, supervision, and discipline of police officers were acceptable. Thus, the City of Aventura is entitled to judgment as a matter of law on the plaintiffs' § 1983 claims. The City of Aventura's motion for summary judgment is granted with respect to Counts XVII - XX.

**D. State law claims against the City of Aventura**

**1.   Maurice's and Fils's false imprisonment claims**

In Counts III and IV Fils and Maurice, respectively, assert tort claims against the City of Aventura for false imprisonment. As the Court stated in subsection B.1 concerning the same false imprisonment claims against the police officers, the evidence, taken in a light most favorable to Fils and Maurice, shows that they cannot establish a necessary element of the tort. As a matter of law, the arrests were not unreasonable because the police had probable cause. The City of Aventura's motion for summary judgment on Counts III and IV is granted.

**IV. CONCLUSION**

Based on the foregoing analysis, it is hereby:

**ORDERED AND ADJUDGED:**

1.   The police officers' motions for summary judgment as to the plaintiffs' false imprisonment claims in Counts I and II are

-62-

GRANTED.

2.    The City of Aventura's motion for summary judgment as to the plaintiffs' false imprisonment claims in Counts III and IV is GRANTED.

3.    Sean Bergert's motion for summary judgment as to Fils's § 1983 excessive force claim in Count V is DENIED.

4.    Charles Carlantone's motion for summary judgment as to Fils's § 1983 claim in Count VI is GRANTED.

5.    Jeffrey Burns's motion for summary judgment as to Fils's § 1983 claim for excessive force in Count VII is DENIED.

6.    Christopher Goranitis's motion for summary judgment as to Fils's § 1983 claim in Count VIII is GRANTED.

7.    Jason Williams's motion for summary judgment as to Fils's § 1983 claim in Count IX is GRANTED.

8.    Harvey Arango's motion for summary judgment as to Fils's § 1983 claim in Count X is GRANTED.

9.    Sean Bergert's motion for summary judgment as to Maurice's § 1983 excessive force claim in Count XI is DENIED.

10.   Charles Carlantone's motion for summary judgment as to Maurice's § 1983 claim in Count XII is GRANTED.

11.   Jeffrey Burns's motion for summary judgment as to Maurice's § 1983 claim in Count XIII is GRANTED.

12. Christopher Goranitis's motion for summary judgment as to Maurice's § 1983 claim in Count XIV is GRANTED.

13. Jason Williams's motion for summary judgment as to Maurice's § 1983 excessive force claim in Count XV is DENIED.

14. Harvey Arango's motion for summary judgment as to Maurice's § 1983 claim in Count XVI is GRANTED.

15. Thomas Ribel, in his individual and official capacities, and the City of Aventura are entitled to qualified immunity from the plaintiffs' § 1983 claims in Counts XVII - XX and, accordingly, Ribel's and the City of Aventura's motions for summary judgment are GRANTED.

16. The police officers' motions for summary judgment as to the plaintiffs' malicious prosecutions claims in Counts XXI and XXII are GRANTED.

17. The police officers' motions for summary judgment as to the plaintiffs' state law battery claims in Counts XXIII and XIV are DENIED with respect to Bergert, Williams, and Barnes, and GRANTED as to Carlantone, Goranitis, and Arango.

**DONE AND ORDERED** in Miami, Florida, August $\overset{7\hspace{-0.3em}\curvearrowright}{2\hspace{-0.1em}0}$, 2010.

Wm M Hoeveler

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

-64-

Copies to:

Counsel of Record;

John Ley, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St. N.W.
Atlanta, Georgia 30303